# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and ST. PAUL MERCURY INSURANCE
COMPANY,

Plaintiffs,

-vs-                                         Case No.  6:07-cv-756-Orl-22GJK

HARRY LEE; MICHAEL A. ROMACK, individually and
d/b/a: Michael A. Romack Builders; CHARLES N.
ROMACK; THE ESTATE OF CYNTHIA MELVINA
HOWARD, by and through its Personal Representative,
Nacretia Rena Howard Williams, and THE ESTATE OF
ELIZABETH HOWARD TIPPINS, by and through its
Personal Representative, Mary Joyce Howard,

Defendants.

_____

# ORDER

## I. INTRODUCTION

Plaintiffs St. Paul Fire and Marine Insurance Company ("St. Paul Fire") and St. Paul

Mercury Insurance Company ("St. Paul Mercury") (collectively, "the Insurers") have filed this

declaratory judgment action to clarify their obligations under two insurance policies potentially

applicable to a fatal car accident.  St. Paul Fire's policy is primary and St. Paul Mercury's is

excess.  The Insurers seek summary judgment declaring that  (1) St. Paul Fire's indemnity

obligation with respect to insureds Michael A. Romack and Charles N. Romack (collectively,

"the Romacks") under the primary insurance policy is limited to $30,000, (2) the Romacks do

not qualify as insureds under St. Paul Mercury's excess policy, and (3) neither Insurer has an

obligation to defend or indemnify Harry Lee under the two policies.  Upon carefully

considering the parties' submissions, the Court determines that the Insurers are entitled to summary judgment on all three points.

## II. BACKGROUND

Michael Romack leased a pickup truck from Lyon Financial Services, Inc. ("Lyon"). The vehicle was used as a work truck in Michael Romack's business, known as Michael A. Romack Builders.  On July 28, 2003, Charles Romack, Michael Romack's son, reported the truck stolen from the Romacks' residence in Osceola County, Florida.[1]  Three days later, the truck was involved in an accident with another vehicle in neighboring Orange County.  The occupants of the other vehicle, Cynthia Melvina Howard and Elizabeth Howard Tippins, were killed.  At the time of the collision, the truck was being driven by Harry Lee.  According to Lee, on the day the accident occurred, he found the truck unoccupied with the keys in it in a high-drug area in the City of Orlando, also in Orange County, so he took it.[2]  It is undisputed that the Romacks did not give Lee express permission to take or operate the truck; in fact, Lee and the Romacks did not know each other.

The personal representatives of the women killed in the accident filed lawsuits in state court against Lyon, American Leasing Company,[3] the Romacks, and Lee.  Those actions were

---

[1]Apparently, the truck was parked between the Romacks' residence and a separate building they used as an office for their contracting business.

[2]There is no evidence that Lee was the person who stole the truck from the Romacks' property.

[3]Apparently, American Leasing was the lessor of a predecessor vehicle leased by Michael Romack.  According to the Insurers, American Leasing transferred title to the original vehicle and assigned its rights under the lease to Lyon.  Later, the original vehicle was replaced with the truck that eventually was involved in the fatal accident.

consolidated.  St. Paul Fire is defending Lyon, the Romacks, and Lee in the underlying action under the primary policy, subject to a reservation of rights.

Lyon is an insured under the primary and excess policies issued by the Insurers.[4]  The Romacks did not have any liability insurance covering the truck at the time of the collision.  Apparently, they did have such insurance at one point, but they allowed the policy to lapse before the accident.

The Insurers brought the present declaratory judgment action against the Romacks, Lee, and the two decedents' estates (through their Personal Representatives).  Count I of the Complaint pertains to the Romacks.  In that count, the Insurers seek a declaration that they have no obligation to indemnify the Romacks (or "any owners/lessors or lessees of the vehicle") in the underlying tort action because Lee was operating the truck without the Romacks' express or implied consent.  Complaint, ¶¶ 54, 60.  Alternatively, the Insurers contend that under the endorsements to the primary policy and Florida's financial responsibility law, St. Paul Fire's indemnity obligation for all claims asserted in the underlying action is limited to a total of $30,000.  Further in Count I, St. Paul Mercury desires a declaration that it has no obligation under the excess policy to defend or indemnify the Romacks.[5]

---

[4]According to the Insureds, the two policies were actually issued to an entity known as US Bancorp, of which Lyon is a subsidiary.

[5]In the event the Court finds there is an indemnity obligation under the excess policy, St. Paul Mercury seeks a declaration that such obligation is not triggered "until the $5 million retention and $250,000 maintenance retention amounts have been met and that its obligation is limited to the amount required by Florida's Financial Responsibility Law."  Complaint, ¶ 63.

Count II of the Complaint concerns Lee.  Therein, St. Paul Fire seeks a declaration that it has no duty to defend or indemnify Lee under the primary policy (1) because Lee was not a protected person under the policy and (2) by operation of the exclusion for expected or intended injury.  Alternatively, St. Paul Fire contends (1) that its indemnity obligation to Lee is limited to $30,000 under the primary policy's endorsements and Florida law and (2) its obligation to defend ends once the limit under the Florida Required Endorsement has been paid.

For its part, St. Paul Mercury seeks a declaration that under the excess policy, it owes Lee no defense or indemnity obligations whatsoever for the claims asserted against him in the underlying action.[6]

Finally in both counts of the Complaint, the Insurers seek a declaration that "their obligations are defined by the terms, limitations, conditions, and exclusions of the policies and by public policy."  Complaint, ¶¶ 64, 71.

### III.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a

---

[6]In the event the Court finds that St. Paul Mercury owes Lee an indemnity obligation under the excess policy, that Insurer seeks a declaration that such obligation is not triggered "until the $5 million retention and $250,000 maintenance retention amounts have been met and that any indemnity obligation is limited to the amount required by Florida's Financial Responsibility Law."  Complaint, ¶ 69.

genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349

(11th Cir. 1996) (quoting *Cox v. Adm'r U. S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified*

*on other grounds,* 30 F.3d 1347 (11th Cir. 1994)). "There is no genuine issue for trial unless the

non-moving party establishes, through the record presented to the court, that it is able to prove

evidence sufficient for a jury to return a verdict in its favor." *Cohen,* 83 F.3d at 1349.  The

Court considers the evidence and all inferences drawn therefrom in the light most favorable to

the non-moving party.  *See Hairston v. Gainesville Sun Pub. Co*., 9 F.3d 913, 918 (11th Cir.

1993).

## IV.  ANALYSIS

### A.  Whether St. Paul Fire's Indemnity Obligation to the Romacks is Limited to $30,000 Under the Primary Policy[7]

This issue turns on the meaning of the phrase "compulsory or financial responsibility

law" as it appears in the primary policy's "Autos Leased to Others - Compulsory or Financial

Responsibility Law Contingent Coverage Only Endorsement."   In pertinent part, that

endorsement provides as follows:

> 2.  The following is added to the Any permitted user section of
> the Who Is Protected Under This Agreement section.
>
> We consider any person or organization who leases or rents an
> auto you lease to others to be a permitted user, but only if:

---

[7]As previously noted, in Count I of the Complaint, the Insurers request a declaration that they have no obligation whatsoever to indemnify the Romacks in the underlying tort action because Lee was operating the truck without the Romacks' express or implied consent.  Alternatively, they seek a declaration that  their indemnity obligation to the Romacks is limited to $30,000.  The Insurers' motion for summary judgment seeks "final" summary judgment but only raises the second point. Accordingly, the Court deems the first point abandoned.

> The person or organization, including any employee or agent of the person or organization, who leases or rents that auto from you has no other available insurance for that auto.  If this occurs, then that person or organization is a permitted driver, *but only to the minimum extent that a compulsory or financial responsibility law applies.*

(Ex. 3 to Doc. No. 52) (emphasis added).

The Insurers insist that the only "compulsory or financial responsibility law" that applies is Fla. Stat. § 324.021(7).  As interpreted by Florida courts, § 324.021(7) "provides the minimum liability coverage that in general must be obtained for a motor vehicle[.]" *General Acc. Ins. Co. of Am. v. S. Ins. Co.,* 563 So.2d 186, 187 (Fla. 5th DCA 1990).  In pertinent part, the statute defines "Proof of financial responsibility" as

> That proof of ability to respond in damages for liability on account of crashes arising out of the use of a motor vehicle:
>
> > (a) In the amount of $10,000 because of bodily injury to, or death of, one person in any one crash;
> >
> > (b) Subject to such limits for one person, in the amount of $20,000 because of bodily injury to, or death of, two or more persons in any one crash; [and]
> >
> > (c) In the amount of $10,000 because of injury to, or destruction of, property of others in any one crash[.]

Fla. Stat. § 324.021(7).

In a double-fatality situation such as this, the statute requires proof that the owner and/or operator be capable of responding to damages in the total sum of $30,000.  Accordingly, say

the Insurers, since the Romacks did not have any liability insurance covering the truck, the financial responsibility endorsement limits St. Paul Fire's indemnity obligation under the primary policy to $30,000.

The Romacks and the Personal Representatives counter that a different financial responsibility law applies.  In that regard, these defendants contend that § 324.021(9)(b)(1) is also a "compulsory or financial responsibility law" within the meaning of the policy endorsement at issue, that the statute requires a lessor to carry much higher limits of liability insurance than § 324.021(7), and that those higher limits apply to the Romacks.

Section 324.021(9)(b) concerns both long-term and short-term automobile leases.  Only subsection (1) of the statute, addressing long-term leases, applies to this case.  Nevertheless, it facilitates this Court's analysis of the issues in this case to examine both subsections of the statute.

Section 324.021 appears in Chapter 324 of the Florida Statutes, which is entitled "Financial Responsibility."  The Chapter's purpose is recited in § 324.011:

> It is the intent of this chapter to recognize the existing privilege to own or operate a motor vehicle on the public streets and highways of this state when such vehicles are used with due consideration for others and their property, and to promote safety and provide financial security requirements for such owners or operators whose responsibility it is to recompense others for injury to person or property caused by the operation of a motor vehicle. Therefore, it is required herein that the operator of a motor vehicle involved in a crash or convicted of certain traffic offenses meeting the operative provisions of s. 324.051(2) shall respond for such damages and show proof of financial ability to respond for damages in future accidents as a requisite to his or her future exercise of such privileges.

Fla. Stat. § 324.011.

Section 324.021 is entitled "Definitions; minimum insurance required." Subsection (9)(b) provides in pertinent part as follows:

> (b) Owner/lessor.--Notwithstanding any other provision of the Florida Statutes or existing case law:
>
> 1. The lessor, under an agreement to lease a motor vehicle for 1 year or longer which requires the lessee to obtain insurance acceptable to the lessor which contains limits not less than $100,000/$300,000 bodily injury liability and $50,000 property damage liability or not less than $500,000 combined property damage liability and bodily injury liability, shall not be deemed the owner of said motor vehicle for the purpose of determining financial responsibility for the operation of said motor vehicle or for the acts of the operator in connection therewith; further, this subparagraph shall be applicable so long as the insurance meeting these requirements is in effect. The insurance meeting such requirements may be obtained by the lessor or lessee, provided, if such insurance is obtained by the lessor, the combined coverage for bodily injury liability and property damage liability shall contain limits of not less than $1 million and may be provided by a lessor's blanket policy.
>
> 2. The lessor, under an agreement to rent or lease a motor vehicle for a period of less than 1 year, shall be deemed the owner of the motor vehicle for the purpose of determining liability for the operation of the vehicle or the acts of the operator in connection therewith only up to $100,000 per person and up to $300,000 per incident for bodily injury and up to $50,000 for property damage. If the lessee or the operator of the motor vehicle is uninsured or has any insurance with limits less than $500,000 combined property damage and bodily injury liability, the lessor shall be liable for up to an additional $500,000 in economic damages only arising out of the use of the motor vehicle. The additional specified liability of the lessor for economic damages shall be reduced by amounts actually recovered from the lessee, from the operator, and from any insurance or self-insurance covering the lessee or operator. Nothing in this subparagraph shall be construed to affect the liability of the lessor for its own negligence.

Fla. Stat. § 324.021(9)(b).

The question at hand is whether § 324.021(9)(b)(1) qualifies as a "compulsory or financial responsibility law" within the meaning of the primary policy's financial responsibility endorsement. After carefully examining the statute, the Court concludes that it does not.

In the case of *Garcia v. Vanguard Car Rental USA, Inc.*, 510 F. Supp. 2d 821 (M.D. Fla. 2007), Judge Hodges of this judicial district conducted a thoughtful analysis of § 324.021(9)(b)(2), the provision applicable to short-term leases, and concluded that it is not a financial responsibility law. While much of Judge Hodges' analysis focused on that provision, rather than the provision governing long-term leases, his opinion did touch on § 324.021(9)(b) as a whole. Moreover, much of Judge Hodges' analysis of § 324.021(9)(b)(2) applies equally to § 324.021(9)(b)(1).

*Garcia* addressed the relationship between § 324.021(9)(b)(2) and the Graves Amendment, codified at 49 U.S.C. § 30106.[8] The Graves Amendment "expressly preempt[s] all state vicarious liability schemes that impose liability on lessors of motor vehicles where the vehicle is involved in an accident through no fault of the lessor." *Garcia,* 510 F. Supp. 2d at 824.[9] In Florida, the Graves Amendment now preempts this States' common-law dangerous

---

[8]*Garcia* addressed a second question: whether the Graves Amendment is constitutional. Judge Hodges concluded that it is.

[9]The Graves Amendment was effective on August 10, 2005. *Garcia,* 510 F. Supp. 2d at 829. The Amendment applies "with respect to any action commences on or after the date of enactment of this section without regard to whether the harm that is the subject of the action, or the conduct that caused the harm, occurred before such date of enactment." 49 U.S.C. § 30106(c). It appears the underlying tort suits were filed sometime in 2005. The Court cannot discern from the record whether they were filed before or after August 10th of that year, the effective date of the Graves Amendment. In any event, the parties have not raised the potential applicability of the Graves Amendment to this case or to the underlying tort suit as an issue before this Court.

instrumentality doctrine as it relates to lessors of motor vehicles.  *Id*. at 826, 829.  Otherwise, under the dangerous instrumentality doctrine, such lessors would be subject to strict vicarious liability for the lessee's negligent operation of the vehicle.  *Id.* at 827.

The question presented in *Garcia* was whether, in addition to preempting Florida's dangerous instrumentality doctrine as applied to automobile lessors, the Graves Amendment also preempted § 324.021(9)(b)(2).  In order to answer that question, Judge Hodges had to determine whether  § 324.021(9)(b)(2) is a financial responsibility law.  This was necessary because the Graves Amendment contains a financial responsibility exception.  That exception provides:

> (b) Financial responsibility laws.--Nothing in this section supersedes the law of any State or political subdivision thereof--
>
> > (1) imposing financial responsibility or insurance standards on the owner of a motor vehicle for the privilege of registering and operating a motor vehicle; or
> >
> > (2) imposing liability on business entities engaged in the trade or business of renting or leasing motor vehicles for failure to meet the financial responsibility or liability insurance requirements under State law.

49 U.S.C. § 30106(b)(1) & (2).

Judge Hodges began his analysis by noting that the Graves Amendment does not define "financial responsibility laws." (The same is true in the instant case: the financial responsibility endorsement in the primary insurance policy does not define "financial responsibility law.") Under such circumstances, Judge Hodges reasoned, the phrase must be given its ordinary meaning.  After consulting definitions in Black's Law Dictionary (8th ed. 1994), Judge Hodges

concluded that "the common usage of the term 'financial responsibility laws' means requiring an owner and/or operator of a motor vehicle to possess and have proof of minimum levels of insurance." *Garcia,* 510 F. Supp. 2d at 830 (footnote omitted).

Next, Judge Hodges examined the two subsections in the Graves Amendment's financial responsibility exception. After doing so, he observed that "both subsections exempt state laws that impose some sort of financial responsibility - *i.e.* insurance - requirements on owners of motor vehicles." *Id.* at 831.

Judge Hodges then reviewed Fla. Stat. § 324.021(9)(b)(2) and determined that it was not a financial responsibility law. In reaching that conclusion, Judge Hodges noted that § 324.021(9)(b)(2) does not impose any insurance requirements on lessors (or anyone else) and does not impose any liability on lessors for failure to meet the insurance requirements otherwise mandated by Florida law. *Id.* "Perhaps most importantly," Judge Hodges continued, "the Court is unaware of any Florida financial responsibility or insurance requirement that owners and/or operators of motor vehicles must possess insurance in the amount [identified in § 324.021(9)(b)(2)]. To the contrary, § 324.021 itself defines the minimum standards for insurance in Florida[.]" *Id.* at 831. Judge Hodges then quoted the $10,000/20,000/10,00 limits required by Florida's general financial responsibility statute, Fla. Stat. § 324.021(7). *Id.* at 831-32. Addressing § 324.021(9)(b) generally, Judge Hodges further stated:

> Thus, it is clear that § 324.021(9)(b) was intended to shift and/or limit financial liability; it does not create insurance requirements or force owners and operators of motor vehicles to maintain a certain level of insurance, and it certainly does not create a private right of action of any kind.

*Id.* at 833.  Based on this reasoning, Judge Hodges concluded that § 324.021(9)(b)(2) is not a financial responsibility law and that the statutory subsection is preempted by the Graves Amendment.  *Id.*

Although there are differences between § 324.021(9)(b)(2), the short-term lease provision addressed in *Garcia*, and § 324.021(9)(b)(1), the long-term lease provision at issue in the instant case,[10] Judge Hodges' principal rationale for deciding that § 324.021(9)(b)(2) is not a financial responsibility law applies equally to § 324.021(9)(b)(1).  Like its short-term lease counterpart,  § 324.021(9)(b)(1) does not require an automobile lessor to do anything.  It does not mandate that the lessor purchase insurance, or maintain a certain level of coverage, and it does not penalize the lessor for failure to comply with Florida's ordinary financial responsibility requirements.  Instead, § 324.021(9)(b)(1) merely affords the long-term lessor the option of avoiding the dangerous instrumentality doctrine by either requiring its lessee to obtain insurance at specified minimum limits, or obtaining its own insurance in a specified minimum amount.  If the lessor chooses this course, the statute provides that the lessor will not be considered the owner of the leased vehicle.  If, on the other hand, the lessor chooses not to

_____

[10]For instance, Judge Hodges noted that § 324.021(9)(b)(2) does not "even mention the term 'financial responsibility,'" and "speaks solely in terms of 'liability.'" *Garcia,* 510 F. Supp. 2d at 831. Section § 324.021(9)(b)(1), on the other hand, does contain the phrase "financial responsibility." However, the inclusion of that phrase does not alter the fact that the subsection does not satisfy the ordinary meaning of the term "financial responsibility law," *i.e.*, § 324.021(9)(b)(1) does not require the vehicle owner and/or operator to maintain minimum levels of insurance and it does not penalize the owner/operator for failure to comply with ordinary financial responsibility requirements.

avail itself of the statutory safe-harbor, it is subject to potential liability under the dangerous instrumentality doctrine as the owner of the vehicle.[11]

Based on the foregoing, this Court concludes that § 324.021(9)(b)(1) is not a "compulsory or financial responsibility law" as that phrase appears in the primary policy's financial responsibility endorsement.  Section § 324.021(7), on the other hand, is such a law; to reiterate, it "provides the minimum liability coverage that in general must be obtained for a motor vehicle[.]" *General Acc. Ins. Co. of Am. v. S. Ins. Co.,* 563 So.2d 186, (Fla. 5th DCA 1990).  Under the financial responsibility endorsement in the primary policy, the Romacks are permitted users only to the minimum extent required by Florida's financial responsibility law, *i.e.*, § 324.021(7).  As applied to this case, § 324.021(7) required coverage in the total sum of $30,000.  Hence, St. Paul Fire's indemnity obligation vis-a-vis the Romacks under the primary policy is limited to $30,000.  On this basis, the Insurers' motion for summary judgment will be granted.

### B.  Whether the Romacks Qualify as Insureds Under the Excess Policy

Section III.1.F.9 of St. Paul Mercury's excess policy defines an insured as including "permitted users of motorized vehicles otherwise insured under this Policy, but only to the extent that a Named Insured is contractually or legally obligated to provide such insurance[.]" (Ex. 6 to Doc. No. 52.)  The parties are in seeming agreement that whether the Romacks are

---

[11]Of course, this analysis does not take into account the Graves Amendment.  As previously stated, that Amendment now preempts Florida's dangerous instrumentality doctrine as it relates to lessors of motor vehicles.

insureds under the excess policy turns on whether US Bancorp and/or Lyon had a legal obligation to provide insurance coverage on the truck.[12]

The Defendants maintain that § 324.021(9)(b)(1), the long-term lease statute analyzed in the preceding section of this Order, required US Bancorp/Lyon to carry liability insurance of not less than $1 million.  This argument is erroneous.  As previously discussed, § 324.021(9)(b)(1) does not obligate the long-term lessor to provide insurance in any amount; it merely affords the lessor the option to do so in order to avoid operation of the dangerous instrumentality doctrine.  Further, the Court agrees with the Insurers that any legal obligation US Bancorp/Lyons may have had under Florida's financial responsibility law to provide insurance on the truck was satisfied by the St. Paul Fire primary policy.  In sum, since the Romacks were not insureds under the excess policy, St. Paul Marine owes them no defense or indemnity obligation.  Accordingly, the Insurers will be granted summary judgment on this point.

### C.  Whether the Insurers Have an Obligation to Indemnify or Defend Lee Under Either Policy

The Insurers seek summary judgment on the basis that, as a matter of law, Lee cannot be deemed a permissive user of the truck under the primary and excess policies.[13]  In response,

---

[12]There is no evidence that US Bancorp or Lyon had any contractual obligation to provide such insurance.

[13]The Insurers also argue that they are entitled to summary judgment against Lee because a default has been entered against him.  Certainly, this entitles the Insurers to summary judgment against Lee.  The parties have not addressed the question of whether the default against Lee prevents the Personal Representatives from arguing that the Insurers owe Lee defense or indemnity obligations under the policies.  Accordingly, the Court will address the merits of the implied permission issue.

the Personal Representatives assert that there is a disputed issue of fact concerning whether Lee had implied permission to drive the truck and was, therefore, a permitted user under the insurance policies.[14]  However, the facts will not bear the strained interpretation urged by the Personal Representatives.  There is simply no evidence from which a reasonable fact-finder could conclude that Lee had implied permission to use the truck.  In fact, his own testimony establishes as a matter of law that he did not.

Distilled to its essence, the Personal Representatives' position is this: (1) the truck was not actually stolen; (2) Charles Romack (or perhaps some other permittee) drove it to Lee's neighborhood; (3) the driver engaged in a transaction in which he rented or exchanged the truck as payment for drugs; (4) under these circumstances, when the drug dealer left the truck parked with the keys on the seat anyone in that neighborhood had implicit permission to use the truck; and (5) Lee was thus a permitted user when he discovered the truck and drove it off.  However, this theory is flawed in several respects.

In the first place, there is simply no evidence from which a reasonable fact-finder could conclude that the truck was not stolen.  The Personal Representatives rely on the fact that on the night of the alleged theft, Charles Romack was not awakened by the sound of barking dogs or the noise of the truck's diesel engine starting.  Ergo, they  posit, Charles Romack is not telling the truth and the truck was not stolen after all.  However, this exceedingly thin evidence is insufficient to create a genuine issue of fact.  Who knows why Charles Romack did not awaken?  There are any number of potential reasons. Perhaps he was sleeping unusually

---

[14]The Romacks do not present any argument on this issue.

soundly that night.  Or maybe the dogs were.  Possibly, the thief was particularly quiet.  Or perhaps there was more than one perpetrator and they pushed the truck for some distance before starting it.  The point is that the argument that  Charles Romack necessarily would have awakened during the theft is pure conjecture.  And if the truck was stolen as reported, there is no way that the thief could grant valid permission to anyone to use the truck, so any subsequent user cannot be deemed a permissive user.  Permission granted by, or through, a thief is certainly not the permission of an owner or an insured.

Suppose the truck wasn't stolen.  There is no evidence from which a reasonable fact-finder could conclude that Charles Romack was the person who drove it to Lee's neighborhood.  The only evidence the Personal Representatives have to support this proposition is that Frederick Pittman, a resident of the neighborhood, says that on one occasion he saw a person he later identified from a photograph as Charles Romack sitting in a truck in the parking lot of the community grocery.  In his affidavit executed in September 2006, Pittman stated that, to the best of his recollection, this occurred at some unspecified time in 2003.  (Pl. Ex. 1 to Feb. 14, 2007, Dep. of Frederick Pittman.)  By the time of his deposition taken approximately six months later, Pittman was even less precise about when he allegedly saw Charles Romack in the grocery parking lot.  Initially, Pittman stated the incident might have occurred three to six months prior to his deposition, which would have been in mid- to late-2006, approximately three years after the accident.  (Pittman Dep. at 17-18.)  Later in his deposition, Pittman vacillated about whether the incident occurred in 2005 or 2006.  (*Id.* at 38.)  Pittman added that he didn't think he would be able to identify someone he saw in a parking lot three years ago.  (*Id.* at 39.)  In the end, Pittman stated that his affidavit would represent his best recollection of

the date the incident occurred.  (Pittman Dep. at 41-49.)  The bottom line is that Pittman's deposition and affidavit are worthless in placing Charles Romack in Lee's neighborhood on the day (or even the month) the truck was driven into the neighborhood, and the Personal Representatives have no other evidence on that point.

Moreover, if the driver wasn't Charles Romack, we are left to speculate who it might have been. Was it someone who had permission to use the truck, or not?[15]  Was it someone who could consent to someone else using the truck, or not?  This gap in the evidence is fatal to the Personal Representatives' implied permission theory.

Assume, however, that even if it wasn't Charles Romack who drove the truck into the neighborhood, it was some other permitted user.  Lee claims that he witnessed a "transaction" between the driver and a drug dealer.  However, Lee observed this incident from a distance and did not hear what was said.  He says he saw the two men drive away in the truck, then later observed the drug dealer return alone with the vehicle.  From these observations and his experience regarding neighborhood goings-on, Lee concluded that the truck's driver had loaned out the truck in exchange for drugs.  Assuming for present purposes that Lee's perception of these events is both accurate and admissible, what is missing is the nature of the arrangement between the driver and the drug-dealer, i.e., what agreement was reached between the two men regarding use and return of the vehicle.  No evidence has been presented regarding what was said between the driver and the alleged drug dealer concerning the scope of use of the vehicle, who was allowed to drive it, if and when it was to be returned, and the like.  For all we know,

---

[15]Of course, if the truck was stolen, the driver may well have been the thief or someone to whom he or she transferred the vehicle.

the driver loaned the car to the alleged drug dealer for ten minutes, with strict instructions not to allow anyone else to drive it.

But the ultimate death knell to the Personal Representatives' implied permission theory is that even if all of their assumptions leading up to Lee's discovery of the truck are correct, they simply do not enable a reasonable fact-finder to conclude that Lee had implicit permission to take possession of the truck and drive it away.  Pure and simple, Lee saw the truck unattended with the keys on the seat, so he took it.  Lee's position that he could take the truck merely because it was exchanged or rented to someone else as a part of a drug transaction is merely the post-hoc rationalization of a thief.  The fact that the authorities elected not to charge Lee with auto theft is legally inconsequential.  To suppose why they did not is to enter the realm of conjecture.[16]  In any event, it would distort the concept of permissive use beyond the bounds of reason to find that Lee had implied permission to drive the truck under the circumstances of this case.

To support their permissive use argument, the Personal Representatives cite *Ming v. Interamerican Car Rental, Inc.,* 913 So.2d 650 (Fla. 5th DCA 2005).  However, that decision is inapposite.  In *Ming*, the daughter of a vehicle lessee found her mother's car keys and drove to her mother's workplace.  Enroute, the daughter struck and killed a pedestrian.  The personal representative of the pedestrian's estate brought a wrongful death action against the rental car

---

[16]Apparently, the State chose to prosecute Lee in connection with the fatal wreck for driving while his license was suspended and leaving the scene of the accident.  At the time of his deposition, Lee was serving a seven year sentence on those charges.

company and the mother.  The lower court granted summary judgment in the defendants' favor.

The Fifth DCA reversed.

Regarding the mother's liability, the appellate court determined that the record presented

material questions of fact regarding whether the daughter had the mother's implied consent to

drive the car.  On that point, the Fifth DCA stated:

> In the instant case, when the evidence is viewed in the light most
> favorable to [the plaintiff], it demonstrates a genuine issue of
> material fact on the issue of implied consent. [The daughter] had
> driven her mother's cars in the past with her mother's knowledge
> and consent. After [the daughter's] license was suspended, [the
> mother] allowed her to use and possess one of her cars while
> living at her boyfriend's house. When [the daughter] moved back
> in with [her mother], [the daughter] occasionally would "sneak"
> her mother's cars out and drive. [The mother's] comment, "You
> know you ain't got no license, you don't need to be driving,"
> taken in the light most favorable to [the plaintiff], is hardly an
> express prohibition.
>
> [The daughter] was traveling towards her mother's workplace to
> bring her the car, when the accident occurred. In a written
> statement to police the day after the accident, [the mother]
> claimed that she was the driver. This is not cogent behavior of a
> person who did not give implied consent to [the daughter] to
> drive the car. The fact that [the daughter] had driven her
> mother's vehicles before with her mother's knowledge, the open
> (although disputed) location of the keys, the familial
> relationship, the stated purpose of [the daughter's] trip and her
> mother's conduct after the accident, all create an issue as to
> implied consent.

913 So.2d at 657-58.

Here, in contrast to *Ming*, (1) there was no familial relationship between the Romacks

and Lee, (2) there was no prior use by Lee, (3) Lee was not driving the truck for any purpose

that benefitted the Romacks, and (4) the Romacks did not engage in any post-accident conduct

that would give rise to a finding of implied consent.  These circumstances materially distinguish *Ming* from the instant case.[17]

In sum, the Insurers are entitled to summary judgment on the issue of whether they have an obligation to defend or indemnify Lee under the primary and excess policies.

## V. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1.   Plaintiffs St. Paul Fire and Marine Insurance Company and St. Paul Mercury Insurance Company's Motion for Final Summary Judgment (Doc. No. 52), filed on October 26, 2007, is GRANTED.

2.   Any other pending motions are MOOT.

3.   The Clerk shall enter a final judgment providing as follows: The Court hereby declares that (1) Plaintiff St. Paul Fire and Marine Insurance Company's indemnity obligation under the St. Paul Fire Primary Policy for the claims asserted, or for any judgment entered, against Charles and Michael Romack in the Underlying Action is limited to $30,000; (2) Plaintiff St. Paul Fire and Marine Insurance Company has no defense or indemnity obligation under the St. Paul Fire Primary Policy for the claims asserted, or for any judgment entered, against Harry Lee in the Underlying Action; (3) Plaintiff St. Paul Mercury Insurance Company

---

[17]The Insurers argue that the Personal Representatives are conflating the dangerous instrumentality doctrine with the concept of permissive use for the purpose of determining whether the driver is an insured under a liability insurance policy.  To support that argument, they cite *Royal Indem. Co. v. Ellsworth,* 2005 WL 2219274, at *1 (M.D. Fla. Sept. 13, 2005), which states that "vicarious liability as the owner of a 'dangerous instrumentality' is inapposite in the context of a permissive use clause in a contract of insurance."  The Court need not resolve that issue to decide this case.

has no defense or indemnity obligation under the St. Paul Mercury Excess Policy for the claims asserted, or for any judgment entered, against Harry Lee in the Underlying Action; and (4) Plaintiff St. Paul Mercury Insurance Company has no defense or indemnity obligation under the St. Paul Mercury Excess Policy for the claims asserted, or for any judgment entered, against Charles and Michael Romack in the Underlying Action.  The judgment shall also provide that the Plaintiffs shall recover their costs of action.

   4.  The Clerk shall close this case.

   **DONE** and **ORDERED** in Chambers, in Orlando, Florida on April <u>28</u>, 2008.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Party